1  DAVID J. GALLO *(California Bar No. 127722)*
   **LAW OFFICES OF DAVID J. GALLO**
2  12702 VIA CORTINA, SUITE 500
   DEL MAR, CALIFORNIA  92014
3  Telephone: (858) 509-3652

4  Attorneys for Plaintiffs,
   S. WESTRON, and J. MILNE
5

6
                 # UNITED STATES DISTRICT COURT
7

8               # NORTHERN DISTRICT OF CALIFORNIA

9
   S. WESTRON, and                          Case Number:
10 J. MILNE,

11         Plaintiffs,

12 v.

13 ZOOM VIDEO
       COMMUNICATIONS, INC., a
14     Delaware corporation,                **COMPLAINT ON BEHALF OF THE
                                             NON-AMERICAN PEOPLES OF THE
15     Defendants.                           FIVE EYES COUNTRIES;
                                             DEMAND FOR JURY TRIAL**
16

17
                                            **CLASS ACTION**
18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT ON BEHALF OF THE NON-AMERICAN PEOPLES OF THE
FIVE EYES COUNTRIES; DEMAND FOR JURY TRIAL – PAGE 1**

**JURISDICTION**

1.     This Court has subject-matter jurisdiction over the claims for relief asserted herein pursuant to Title 28, U.S.C., Section 1332(d)(2)(B).

**VENUE**

2.     Venue of this civil action is properly fixed in the Northern District of California, pursuant to Title 28, U.S.C.,Section 1391(b)(2); at least a substantial part, and likely all, of the wrongful conduct which is the subject of this civil action were planned, directed, and perpetrated within the Northern District of California.

**DIVISIONAL ASSIGNMENT**

3.     Plaintiffs are informed and believe, and on such basis aver, that all, or at least a substantial part, of the events and/or omissions giving rise to the claims asserted herein occurred within the County of Santa Clara, California. (*Cf.:* Civil L.R. 3-2(c).)

**PARTIES**

4.     Plaintiff, S. Westron **(hereinafter "Westron"),** is an individual citizen of the United Kingdom of Great Britain and Northern Ireland **(hereinafter the "UK").**

5.     Plaintiff, J. Milne **(hereinafter "Milne"),** is an individual citizen of New Zealand who, during at least some of the times relevant hereto, has been domiciled in Australia.

6.     Plaintiffs are informed and believe, and thereupon aver, that Defendant, Zoom Video Communications, Inc. **(hereinafter "Zoom"),** is a corporation organized and existing pursuant to the laws of the State of Delaware, whose principal place of business is within the Northern District of California.

///

///

///

## CLASS ALLEGATIONS

7.    On or about 21 April 2022, this Court granted final approval of a class-action settlement in the civil action **(hereinafter the "Prior Litigation")** styled, "In re: Zoom Video Communications, Inc. Privacy Litigation", Case No. 3:20-cv-02155-LHK in the above-captioned court.  (*See,* Prior Litigation Document 249.)

8.    Judgment was entered the same day.  (*See,* Prior Litigation Document 250.)

9.    The Settlement Class in the Prior Litigation was limited by its express terms to, "... Persons in the United States ..." (*See,* Prior Litigation Document 191-1, Page 9, at § 1.40.)

10.    The limitation of the Settlement Class in the Prior Litigation to, "... Persons in the United States ...", did not result from inadvertence.

11.    The limitation of the Settlement Class in the Prior Litigation to, "... Persons in the United States ...", excluded the people of Australia, Canada, New Zealand, and the United Kingdom.

12.    The people of Australia, Canada, New Zealand, and the United Kingdom, share our values, our common language (*see,* Cal. Const., art. III, § 6), and even the common law (*see,* Civ. Code, § 22.2).

13.    Australia, Canada, New Zealand, and the United Kingdom, are so closely aligned with the United States that they are the five parties to the Five Eyes agreement, a long-standing secret intelligence agreement that allocates electronic surveillance collection among the five states and anticipates a high level of coordination and intelligence sharing. *See, ex rel., Intelligent Waves, LLC v. United States,* 135 Fed.Cl. 299, 302 n.1 (2017).

14.    The members of the proposed Plaintiff Class described, *infra,* are so numerous that joinder of all members is impractical.  Zoom's SEC Form 10-K, filed 18 March 2021, states that Zoom's, "... platform addresses the communications needs

of users worldwide, and [Zoom] see[s] international expansion as a major opportunity." The same document recites that thirty-one percent (31%) of Zoom's total revenue in the year commencing 1 February 2020, and concluding 31 January 2021, was derived from marketing areas to which Zoom refers as Asia-Pacific ("APAC"), and Europe, Middle East, and Africa ("EMEA"). On the basis of the foregoing, Plaintiffs are informed and believe, and upon such information and belief aver, that there are hundreds of thousands of members of the proposed Plaintiff Class described, *infra.*

15.     There are numerous questions of both law and fact common to the members of the proposed Plaintiff Class described, *infra.* Common issues will be enumerated within Plaintiffs' forthcoming motion for class certification.

16.     Plaintiffs' claims asserted herein are typical of the claims of the members of the proposed Plaintiff Class described, *infra.* Each class member's claim arises from the same course of events; Plaintiffs' claims are, at a minimum, reasonably co-extensive with those of the absent class members.

17.     Plaintiffs will fairly and adequately protect the interests of the proposed Plaintiff Class described, *infra;* neither any Plaintiff, nor their undersigned counsel, has any conflict of interest with other class members; and (2) Plaintiffs and their undersigned counsel will prosecute this action vigorously on behalf of the proposed Plaintiff Class described, *infra.*

18.     With regard to each claim for injunctive relief asserted herein, Zoom has acted or refused to act on grounds that apply generally to each Class and Subclass described, *infra,* so that final injunctive relief or corresponding declaratory relief is appropriate respecting the proposed Plaintiff Class described, *infra,* as a whole.

19.     With regard to each claim for monetary relief asserted herein, questions of law and/or fact common to the class members will predominate over any questions affecting only individual members; class-action treatment will be superior to other

available methods for fairly and efficiently adjudicating the controversy.

## PROPOSED CLASS DEFINITION

20.    The Plaintiff Class which Plaintiffs propose to represent is proposed to be defined as follows:

> All Persons in Australia, Canada, New Zealand, and/or the United Kingdom of Great Britain and Northern Ireland, who, at any time subsequent to 31 May 2018, registered, used, opened, or downloaded the Zoom Meetings Application ("App"), except for (i) all Persons who have only registered, used, opened, or downloaded the Zoom Meetings App through an Enterprise-Level Account or a Zoom for Government Account, (ii) Zoom and its officers and directors; (iii) any judicial officer of the United States who exercises any authority over the above-captioned civil action; and (iv) any employee of any court which exercises any authority over the above-captioned civil action.

> ... including any and all sub-classes the Court may deem appropriate, and/or such other class defined in such manner as the Court may deem conducive to the use of the class-action procedural device to adjudicate  the claims asserted herein.

## FACTS

21.    Over the past few decades a new industry has arisen which generates hundreds of billions of dollars of annual revenue by targeting consumers with espionage through their phones and computers.  The perpetrators of this massive espionage campaign would state that their objective is to gather sufficient information **(hereinafter "Personal Data")** about an individual to provide them with "relevant" and "personalized" advertisements.  This is not, however, limited to innocent matter such as advertising diapers to a person who has just welcomed a new baby into their

home.  The Personal Data gathered about an individual can be used to target that person with a political advertisement that stresses the candidate's agreement with the targeted person in respect to a particular contentious issue, while omitting any reference to the candidate's views on a different contentious issue as to which the target vehemently disagrees.  It is axiomatic that the advertising company must know the target's views on various issues in order to so manipulate the target.  Similarly, knowledge about a person's religious beliefs, marital status, sexual orientation, occupation, work habits, sleep habits, and relationships with family members, can all be used to manipulate the targeted consumers to alter their personal spending behaviors.

22.    In order to aggregate Personal Data about a particular target, it is valuable for the perpetrators to track each target as they use various Internet-connected devices (*e.g.,* their phone and their laptop), so the perpetrators can develop a dossier **(hereinafter a "Dossier")** containing the collected data pertaining to a particular targeted consumer.

23.    Alphabet, Inc. **(hereinafter "Google"),** reported over $182 billion in revenue in 2020.  Google's SEC Form 10-K, filed 3 February 2021,  recites:

"***How we make money*** [¶] Our advertising products deliver relevant ads at just the right time, to give people useful commercial information, regardless of the device they're using. We also provide advertisers with tools that help them better attribute and measure their advertising campaigns. ... [¶] We aim to ensure great user experiences by serving the right ads at the right time and by building deep partnerships with brands and agencies. We also seek to improve the measurability of advertising so advertisers know when their campaigns are effective."

24.    According to a news media report dated 26 April 2022, Google, and similar companies, which have custody of sensitive personal information have from

time to time been tricked into releasing that information to criminal organizations of various kinds:

https://finance.yahoo.com/news/tech-giants-duped-giving-data-173424811.html

25.    Meta Platforms, Inc. **(hereinafter "Facebook"),** reported approximately $86 billion in revenue in 2020.  Facebook's SEC Form 10-K, filed 28 January 2021, recites:

> "We generate substantially all of our revenue from selling advertising placements to marketers. Our ads enable marketers to reach people based on a variety of factors including age, gender, location, interests, and behaviors."

26.    According to a news media report dated 26 April 2022, Facebook engineers have stated in internal communications that Facebook, "... do[es] not have an adequate level of control and explainability over how ... [its] systems use data ...":

> https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes

27.    Zoom offers videoconferencing services.  Users of these services include both accountholders and non-accountholders.

28.    Zoom's SEC Form 10-K, filed 18 March 2021, states:

> "[Zoom] provide[s] a video-first unified communications platform that delivers happiness and fundamentally changes how people interact. ... The cornerstone of [Zoom's] platform is Zoom Meetings, around which [Zoom] provide[s] a full suite of products and features designed to give users an easy, reliable, and innovative unified communications experience. Users are comprised of both hosts who organize video meetings and the individual attendees who participate in those video meetings."

29.    Zoom, or its authorized agents, have created an application designed for

**COMPLAINT ON BEHALF OF THE NON-AMERICAN PEOPLES OF THE FIVE EYES COUNTRIES; DEMAND FOR JURY TRIAL – PAGE 7**

Apple's iPhones, and an application designed for Android phones, **(hereinafter collectively the "Zoom App").**

30.     Westron and Milne both installed the Zoom App onto their phones, and have used it.

31.     A published media report dated 26 March 2020 states, *inter alia:* "The Zoom app notifies Facebook when the user opens the app, details on the user's device such as the model, the time zone and city they are connecting from, which phone carrier they are using, and a unique advertiser identifier created by the user's device which companies can use to target a user with advertisements."[1]

32.     On 27 March 2020, Zoom admitted to the truth of the above-quoted media report dated 26 March 2020; Zoom's inculpatory statement will be admissible at trial. (*See,* Rule 801(2)(2), Fed.R.Evid.)

33.     Zoom may claim that it ceased and desisted from providing such data to Facebook.   However, Plaintiffs' undersigned counsel has reviewed much of this Court's publicly-available files in the Prior Litigation, but has been unable to locate any evidence that would support such a claim.   In reliance upon established axioms of the law of evidence, Plaintiffs are therefore informed and believe, and thereupon aver, that the practice disclosed in the above-quoted media report dated 26 March 2020 has continued, and continues to the present day.

34.     Plaintiffs are informed and believe, and upon such information and belief aver, that, without the knowledge or permission of Westron, Milne, or Class Members, Zoom caused the Zoom App to transmit sensitive personal data to a third party (*i.e.,*

---

[1]      Plaintiffs herein refer to the, "... unique advertiser identifier ...", as a Dossier.   The referenced article is found at: https://www.vice.com/en/article/k7e599/zoom-ios-app-sends-data-to-facebook-even-if-you-dont-have-a-facebook-account

Facebook); this sensitive personal data includes, but may not be limited to, the fact that the user is using the Zoom App (which in turn discloses when the user is engaged in a videoconference), detailed information about the user's iPhone, including Application Bundle Identifier, Application Instance ID, Application Version, Device Carrier, iOS Advertiser ID, iOS Device CPU Cores, iOS Device Disk Space Available, iOS Device Disk Space Remaining, iOS Device Display Dimensions, iOS Device Model, iOS Language, iOS Timezone, and iOS Version.

35.    A user of the Zoom App would not perceive that the Zoom App was collecting, let alone disseminating, the above-referenced sensitive personal data.

36.    Plaintiffs are informed and believe, and upon such information and belief aver, that, without the knowledge or consent of the subjects of this information, Facebook uses this information in conjunction with other information it has obtained to create and/or enhance Dossiers it maintains as to Westron, Milne, and Class Members.

37.    A published media report last updated 26 May 2021 states, *inter alia,* that Zoom, "... allow[s] third-party access to private personal data":

"This may come in the form of outright data sharing or by using local third-party analytics software (such as Google Analytics, which collects a plethora of user information)"[2]

38.    The above-quoted published media report last updated 26 May 2021 links to a Wikipedia article which, as of 26 May 2021, stated:

"Google Analytics is used to **track website activity** such as session duration, pages per session, bounce rate etc. of individuals using the site, along with the information on the source of the traffic. It can be integrated with Google Ads,[] with which users can create and review

---

[2]    https://privacyspy.org/product/zoom/

**COMPLAINT ON BEHALF OF THE NON-AMERICAN PEOPLES OF THE FIVE EYES COUNTRIES; DEMAND FOR JURY TRIAL – PAGE 9**

online campaigns by tracking landing page quality and conversions (goals). Goals might include sales, lead generation, *viewing a specific page, or downloading a particular file.* Google Analytics' approach is to show high-level, dashboard-type data for the casual user, and more in-depth data further into the report set. Google Analytics analysis can identify poorly performing pages with techniques such as funnel visualization, where visitors came from (referrers), how long they stayed on the website and their geographical position. It also provides more advanced features, including custom visitor segmentation.[] Google Analytics e-commerce reporting can track sales activity and performance. The e-commerce reports shows a site's transactions, revenue, and many other commerce-related metrics.

\*        \*        \*

"... Whenever someone visits a website that uses Google Analytics, Google tracks that visit via the users' IP address in order to *determine the user's approximate geographic location.* ... Google has also released a browser plug-in that turns off data about a page visit being sent to Google, however, this browser extension is not available for mobile browsers.[]"[3] (Emphasis added.)

39.     In the tradecraft of the consumer espionage industry, IP addresses are used not only to determine a subject's physical location, but also to correlate the user's device to other devices which use the same IP address.  This, in turn, allows tracking of the user's activities among several devices, and also facilitates linking the user to cohabitants, coworkers, and companions.

40.     The Prior Litigation was prosecuted by able and respected class counsel,

---

[3]     http://web.archive.org/web/20210512194744/https://en.wikipedia.org/wiki/Google_Analytics

who had conducted, "comprehensive discovery".[4] The information provided on discovery in the Prior Litigation was so highly sensitive that it actually resulted in a dispute over the circumstances under which counsel could provide, "Highly Confidential – Attorneys' Eyes Only", documents to even their *consulting* experts.[5] With the benefit of that comprehensive discovery, the able and respected class counsel in the Prior Litigation reported to this Court that Zoom does not merely provide IP addresses to Google, but that Zoom also provides users' precise Global Positioning System data to Google.[6]   On the basis of the foregoing, Plaintiffs are informed and believe, and upon such information and belief aver, that, Zoom provides to Google the precise physical locations of Plaintiffs and Class Members.

41.    Plaintiffs are informed and believe, and upon such information and belief aver, that the above-enumerated sensitive personal data were used by one or more commercial espionage companies (including, at a minimum, Google) to monitor the physical location of Plaintiffs and Class Members.

42.    Plaintiffs are informed and believe, and upon such information and belief aver, that, without the knowledge or permission of Plaintiffs and Class Members, Zoom caused the Zoom App to transmit sensitive personal data to a third party (*i.e.,* Google); this sensitive personal data includes, but may not be limited to, the precise physical locations of Plaintiffs and Class Members, and when and for how long they used Zoom.

43.    A user of the Zoom App would not perceive that the Zoom App was

---

[4]    *See, ex rel.,* Clerk's file in Prior Litigation, at Document 191, ¶ 6, on ECF Pages 2-3.

[5]    *See, ex rel.,* Clerk's file in Prior Litigation, at Document 138-1, ¶¶ 2.7, 7.4(a), on ECF Pages 2, 11; *see also,* Documents 138, 148.

[6]    *See, ex rel.,* Clerk's file in Prior Litigation, at Document 179, ¶ 111, on ECF Page 31.

collecting, let alone disseminating, the above-referenced sensitive personal data.

44.    Plaintiffs are informed and believe, and upon such information and belief aver, that, without the knowledge or consent of the subjects of this information, Google uses this information in conjunction with other information it has obtained to create and/or enhance Dossiers it maintains as to Plaintiffs and Class Members.

## PROPOSED CLASS REPRESENTATIVES

45.    Westron has never been a citizen or resident of the United States.

46.    Westron began to use Zoom in early 2020.

47.    Westron was not present in the United States at any time after he first began to use Zoom, until he visited the United States in late May, 2022 (*i.e.,* after entry of final Judgment in the Prior Litigation).

48.    Westron does not believe he was provided with the Court Approved Notice of Class Action Settlement which was issued in the Prior Litigation on or about 6 December 2021; Westron assumes this is because he was not within the Class Definition in the Prior Litigation, and was therefore not a member of that Settlement Class.

49.    Westron has never used the Zoom videoconferencing service from any location within the United States.

50.    Westron has used the Zoom videoconferencing service from various locations within the UK, as well as from France, Spain, and the United Arab Emirates.

51.    On or about 19 April 2020, shortly after he began using Zoom, Westron purchased a Zoom Standard Pro Monthly subscription, at a monthly cost of GBP 14.39 per month (*i.e.,* GBP 11.99 + GBP 2.40 VAT [*i.e.,* Value Added Tax]).

52.    Zoom's invoice for Westron's Zoom Standard Pro Monthly subscription was issued from 55 Almaden Boulevard, 6th Floor, in San Jose, California, to Westron's home address at the time in the UK.

53.    Prior to purchasing his Zoom Standard Pro Monthly subscription,

**COMPLAINT ON BEHALF OF THE NON-AMERICAN PEOPLES OF THE FIVE EYES COUNTRIES; DEMAND FOR JURY TRIAL – PAGE 12**

Westron became aware of, and believed, public claims by Zoom that the Zoom videoconferencing was secure (i.e., that persons not invited to be parties to Zoom videoconferences could not hear or see Zoom videoconferences or join into private Zoom videoconferences).

54.     At the time Westron was considering purchasing his Zoom Standard Pro Monthly subscription, Zoom's website falsely stated that Zoom calls were secured with end-to-end encryption.

55.     Prior to purchasing his Zoom Standard Pro Monthly subscription, Westron was aware of public claims by Zoom that (a) Zoom does not sell users' data; (b) Zoom takes privacy seriously and adequately protects users' personal information; and (c) Zoom's video conferences are secured with end-to-end encryption and are protected by passwords and other security measures.

56.     Zoom's representations that Zoom's video conferences are secured with end-to-end encryption were false at the time they were made; Zoom may later have launched end-to-end encryption, but not until millions of Zoom users had used Zoom for many months having been told that their Zoom calls were end-to-end encrypted when they were not.

57.     Westron reasonably believed Zoom's claims, and Zoom's claimed security attributes of the Zoom videoconferencing service were important to Westron.

58.     Westron reasonably believed that the public claims by Zoom that the Zoom videoconferencing service was secure (i.e., that persons not invited to be parties to Zoom videoconferences could not hear or see Zoom videoconferences or join into private Zoom videoconferences) were true.

59.     Westron reasonably relied upon the public claims by Zoom that the Zoom videoconferencing service was secure (i.e., that persons not invited to be parties to Zoom videoconferences could not hear or see Zoom videoconferences or join into private Zoom videoconferences).

**COMPLAINT ON BEHALF OF THE NON-AMERICAN PEOPLES OF THE FIVE EYES COUNTRIES; DEMAND FOR JURY TRIAL – PAGE 13**

60. Westron used the Zoom Waiting Room, Mute on Entry, and No ability for [non-host] users to share their screens features.

61. Westron used Zoom to confer privately with an attorney in the UK who was then representing him on an unrelated matter; Westron verified on the Zoom App (by clicking on the green shield), which resulted in an assurance that encryption was enabled.

62. Westron was not aware, and did not understand, that Zoom would collect and share his personal information with third parties who would use that personal information to assemble data about Mr. Westron for purposes of targeted advertising and to attempt to influence Mr. Westron's behaviors.

63. Westron did not give Zoom permission to access, take or use his personally identifiable information.

64. Westron relied upon Zoom's promises that (a) Zoom does not sell users' data; (b) Zoom takes privacy seriously and adequately protects users' personal information; and (c) Zoom's video conferences are secured with end-to-end encryption and are protected by passwords and other security measures.

65. If Westron had known that the video conferencing service was not secure, or if Westron had known that Zoom had failed to secure Westron's personally identifiable information, he would not have purchased a Zoom Pro account (or he would have paid less for it).

66. Westron has accessed the Zoom videoconferencing service from, at a minimum, the following phones and computers:

a. From the time he initially used Zoom until September, 2020, Westron accessed Zoom from his iPhone 6;

b. From the time he initially used Zoom until July, 2021, Westron also accessed Zoom from his iPhone X;

c. From and after August, 2020, Westron also accessed Zoom from a phone

**COMPLAINT ON BEHALF OF THE NON-AMERICAN PEOPLES OF THE FIVE EYES COUNTRIES; DEMAND FOR JURY TRIAL – PAGE 14**

called, "Oppo A9", which uses an Android operating system;

d.   From and after July, 2021, Westron has also accessed Zoom from his iPhone 12;

e.   From the time he initially used Zoom until September, 2020, Westron also accessed Zoom from his Dell Lattitude 7400, which uses the Windows operating system;

f.   From the time he initially used Zoom until September, 2020, Westron also accessed Zoom from his Microsoft Surface Pro 6, which uses the Windows operating system;

g.   From and after September, 2020, Westron has accessed Zoom from two different Microsoft Surface Pro 7 devices, which use the Windows operating system;

h.   From and after April, 2021, Westron has also accessed Zoom from his Dell Lattitude 7410, which uses the Windows operating system.

67.   Through the end of 2021, Westron accepted updated software from Zoom at or near the time it was issued, and also accepted updated Apple, Android, and Windows operating system software on his various devices as those were issued; for example, Westron's records indicate that Zoom's "June 5, 2020 version 5.0.5 (26225.0603)" was downloaded into his iPhone X on 13 June 2020.

68.   As of January, 2022, the version of Zoom software on Westron's iPhone 12 is Version 5.9.1.

69.   As of January, 2022, the version of Zoom software on Westron's Oppo A9 is Version 5.9.1.3642.

70.   As of January, 2022, the version of Zoom software on Westron's Surface Pro 7 is Version 5.9.1.

71.   As of January, 2022, the version of Zoom software on Westron's Dell Latitude 7410 is Version 5.6.1.

**COMPLAINT ON BEHALF OF THE NON-AMERICAN PEOPLES OF THE FIVE EYES COUNTRIES; DEMAND FOR JURY TRIAL – PAGE 15**

72.    Milne has never been a citizen or resident of the United States.

73.    Milne began to use Zoom in 2018.

74.    Milne has not been present in the United States at any time after April of 2019.

75.    Milne does not believe he was provided with the Court Approved Notice of Class Action Settlement which was issued in the Prior Litigation on or about 6 December 2021; Milne assumes this is because he was not within the Class Definition in the Prior Litigation, and was therefore not a member of that Settlement Class.

76.    Milne has no recollection of ever having used the Zoom videoconferencing service from any location within the United States.

77.    Milne has used the Zoom videoconferencing service from various locations within Australia and New Zealand.

78.    On or about 9 April 2020, Milne purchased a Zoom Standard Pro Monthly subscription, at a cost of AUD 23.09 per month (*i.e.,* AUD 20.99 + AUD 2.10 GST [*i.e.,* Goods and Service Tax]).

79.    Zoom's invoice for Milne's Zoom Standard Pro Monthly subscription was issued from 55 Almaden Boulevard, 6th Floor, in San Jose, California, to Milne's home address at the time in Australia.

80.    Prior to purchasing his Zoom Standard Pro Monthly subscription, Milne became aware of, and believed, public claims by Zoom that the Zoom videoconferencing was secure (i.e., that persons not invited to be parties to Zoom videoconferences could not hear or see Zoom videoconferences or join into private Zoom videoconferences).

81.    At the time Milne was considering purchasing his Zoom Standard Pro Monthly subscription, Zoom's website falsely stated that Zoom calls were secured with end-to-end encryption.

82.    Prior to purchasing his Zoom Standard Pro Monthly subscription, Milne

was aware of Zoom's public claims that (a) Zoom does not sell users' data; (b) Zoom takes privacy seriously and adequately protects users' personal information; and (c) Zoom's video conferences are secured with end-to-end encryption and are protected by passwords and other security measures.

83.    Zoom's representations that Zoom's video conferences are secured with end-to-end encryption were false at the time they were made; Zoom may later have launched end-to-end encryption, but not until millions of Zoom users had used Zoom for many months having been told that their Zoom calls were end-to-end encrypted when they were not.

84.    Milne reasonably believed Zoom's claims, and Zoom's claimed security attributes of the Zoom videoconferencing service were important to Milne.

85.    Milne reasonably believed that the public claims by Zoom that the Zoom videoconferencing service was secure (i.e., that persons not invited to be parties to Zoom videoconferences could not hear or see Zoom videoconferences or join into private Zoom videoconferences) were true.

86.    Zoom reasonably relied upon the public claims by Zoom that the Zoom videoconferencing service was secure (i.e., that persons not invited to be parties to Zoom videoconferences could not hear or see Zoom videoconferences or join into private Zoom videoconferences).

87.    Milne used the Zoom Waiting Room, and No ability for [non-host] users to share their screens features.

88.    Milne used Zoom to confer privately with one or more attorneys representing him on unrelated matters, with one or more mortgage brokers, and with one or more of his treating physicians; Milne verified on the Zoom App (by clicking on the green shield), which resulted in an assurance that encryption was enabled.

89.    Milne was not aware, and did not understand, that Zoom would collect and share his personal information with third parties who would use that personal

information to assemble data about Mr. Milne for purposes of targeted advertising and to attempt to influence Mr. Milne's behaviors.

90.    Milne did not give Zoom permission to access, take or use his personally identifiable information.

91.    Milne relied upon Zoom's promises that (a) Zoom does not sell users' data; (b) Zoom takes privacy seriously and adequately protects users' personal information; and (c) Zoom's video conferences are secured with end-to-end encryption and are protected by passwords and other security measures.

92.    If Milne had known that the video conferencing service was not secure, or if Milne had known that Zoom had failed to secure Milne's personally identifiable information, he would not have purchased a Zoom Pro account (or he would have paid less for it).

93.    Milne has accessed the Zoom videoconferencing service from, at a minimum, the following phones and computers:

a.    Macbook;

b.    iPhone prior to about April, 2020; and

c.    iPhone X from and after about April, 2020.

94.    Through early 2022, Milne generally accepted updated software from Zoom at or near the time it was issued, and also accepted updated Apple operating system software on his various devices as those were issued.

95.    The Zoom App on Milne's iPhone X today is Version 5.9.2.

**FIRST CLAIM FOR RELIEF**
**(for invasion of privacy)**
**(Cal. Const., art. I, § 1)**
**(Cal. Civ. Code, § 22.2)**
**(by Plaintiffs and the Plaintiff Class, against Defendant, Zoom)**

96.    The averments contained in paragraphs 1 through 95 hereof are incorporated herein by reference.

97.    The Constitution of the State of California provides, *inter alia:*

**COMPLAINT ON BEHALF OF THE NON-AMERICAN PEOPLES OF THE FIVE EYES COUNTRIES; DEMAND FOR JURY TRIAL – PAGE 18**

"**<u>All</u> people** are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, **and <u>privacy.</u>**"

(*See,* Cal. Const., art. I, § 1. [Emphasis added.])

98.    The words, "... and privacy", were added to the above-quoted Article I, section 1 of the California Constitution by an initiative **(hereinafter the "Voter Initiative")** adopted by the voters on 7 November 1972.

99.    Article I, section 1 of the California Constitution creates a private right of action against private as well as governmental entities.

100.    As the Supreme Court has noted, the ballot argument in favor of the Voter Initiative observes that the California constitutional right of privacy:

"... prevents government and business interests from [1] collecting and stockpiling unnecessary information about us and from [2] misusing information gathered for one purpose in order to serve other purposes or to embarrass us."[7]

101.    Zoom invaded the privacy of Plaintiffs and the Plaintiff Class, at a minimum, in the manners set out above, including provision to Google of the precise physical locations of Plaintiffs and Class Members, as well as the provision of other sensitive personally identifiable information to Google and Facebook (as described above).

102.    This invasion of privacy could not have been discovered by the exercise of reasonable diligence, and was unknown to Plaintiffs until in or after December of 2021, at which time there was worldwide multi-outlet dissemination of information regarding the Prior Litigation and the then-proposed settlement thereof.  Prior to this

---

[7]    *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 35-36.

**COMPLAINT ON BEHALF OF THE NON-AMERICAN PEOPLES OF THE FIVE EYES COUNTRIES; DEMAND FOR JURY TRIAL – PAGE 19**

worldwide multi-outlet dissemination of information regarding the Prior Litigation, neither Plaintiffs, nor Class Members, had any reason to have, (1) suspicion of wrongdoing; (2) knowledge of harm; or (3) knowledge of cause of harm such that any of them should believe he or she is entitled to recourse.

103.   Plaintiffs and the Class Members had specific, legally protected privacy interests in the data taken and disseminated both because it reveals sensitive and confidential matter, and precludes their making intimate personal decisions or conducting personal activities without observation, intrusion, or interference.

104.   Plaintiffs and the Class Members had a reasonable expectation of privacy regarding the above-described sensitive personally identifiable information.

105.   This above-described invasion of privacy is a serious invasion, precisely because the above-described sensitive personally identifiable information was used to create and contribute to electronic Dossiers used to follow the internet activities of Plaintiffs and the Class Members, including websites visited, thereby revealing personal interests of even the most intimate nature, as well as contacts with medical providers of all kinds, and even commercial ties to banks and businesses.

106.   This above-described invasion of privacy has proximately caused and inflicted actual damage to Plaintiffs and the Class Members.

WHEREFORE, Plaintiffs and the Class Members request relief as set forth hereinbelow.

### SECOND CLAIM FOR RELIEF
**(for breach of implied contract)**
**(Cal. Civ. Code, § 22.2)**
**(by Plaintiffs and the Plaintiff Class, against Defendant, Zoom)**

107.   The averments contained in paragraphs 1 through 106 hereof are incorporated herein by reference.

108.   Zoom provided videoconferencing services Plaintiffs and Class Members.

109.   In exchange, Zoom received benefits in the form of monetary payments

1   and/or other valuable consideration, *e.g.*, access to their private and sensitive personal
2   data.

3        110.   Zoom acknowledged these benefits and accepted or retained them.

4        111.   In using Zoom videoconferencing services, Plaintiffs and Class Members
5   continually provide Zoom with their valuable private and sensitive personal
6   information.

7        112.   By providing that information, and upon Zoom's acceptance of that
8   information, Plaintiffs and Class Members, on the one hand, and Zoom, on the other,
9   entered into implied contracts, separate and apart from Zoom's terms of service, under
10  which Zoom agreed to and was obligated to take reasonable steps to secure and
11  safeguard that sensitive information.

12       113.   All parties understood that such security was integral and essential to
13  Zoom's entire line of business – secure video conferencing services.

14       114.   Under those implied contracts, Zoom was obligated to provide Plaintiffs
15  and Class Members with Zoom meetings that were suitable for their intended purpose
16  of providing secure video conferencing services, rather than other video conferencing
17  services vulnerable to unauthorized access, incapable of providing safety and security,
18  and instead actually utilized to track its users' personal data for commercial purposes.

19       115.   Without such implied contracts, Plaintiffs and Class Members would not
20  have used Zoom meetings and would not have conferred benefits on Zoom, but rather
21  would have chosen alternative video conferencing services that did not present these
22  privacy and safety risks.

23       116.   Plaintiffs and Class Members have fully performed their obligations
24  under these implied contracts.

25       117.   As described hereinabove, Zoom did not take reasonable steps to
26  safeguard Plaintiffs' and Class Members' private and sensitive personal information.
27  In fact, Zoom willfully violated those privacy interests by tracking and disclosing

28

**COMPLAINT ON BEHALF OF THE NON-AMERICAN PEOPLES OF THE
FIVE EYES COUNTRIES; DEMAND FOR JURY TRIAL – PAGE 21**

1  Plaintiffs' and Class Members' sensitive personal data to third parties without consent.

2      118.    Because Zoom failed to take reasonable steps to safeguard Plaintiffs' and
3  Class Members' private and sensitive personal information, Zoom has breached its
4  implied contracts with Plaintiffs and Class Members.

5      119.    Zoom's failure to fulfill its obligation to safeguard Plaintiffs' and Class
6  Members' private and sensitive personal information resulted in Plaintiffs and Class
7  Members receiving video conferencing services that were of less value than they
8  provided consideration for (*i.e.*, unsecure video conferencing services without
9  adequate security).

10     120.    Because Plaintiffs and Class members provided valuable consideration
11 for secure video conferences and privacy protections they did not receive – even
12 though such protections were a material part, if not the very essence, of their contracts
13 with Zoom – the full benefit of their bargain.

14     121.    As a result of Zoom's conduct, Plaintiffs and Class Members have
15 suffered actual damages in an amount equal to the difference between: (a) the value
16 of the video conferencing services for which they provided valuable consideration (on
17 the one hand), and (b) the unsecure video conferencing services they actually received
18 (on the other hand).

19     122.    One of the covenants of the implied contracts is an implied covenant of
20 good faith and fair dealing.

21     123.    Under the implied covenant of good faith and fair dealing, Zoom is
22 obligated, at a minimum, (a) to implement proper procedures to safeguard the personal
23 information of Plaintiffs and other Class Members; (b) to refrain from disclosing,
24 without authorization or consent, the personal information of Plaintiffs and other Class
25 Members to any third parties; (c) to promptly and accurately notify Plaintiffs and other
26 Class Members of any unauthorized disclosure of, access to, and use of their personal
27 information; and (d) to maintain adequate security and proper encryption in Zoom's

28

1   videoconferences.

2      124.   Zoom breached the implied covenant of good faith and fair dealing by,

3   among other things:

4      •   disclosing Plaintiffs' and other Class Members' personal information to

5          unauthorized third parties, including Facebook and Google;

6      •   allowing third parties to access the personal information of Plaintiffs and

7          other Class Members;

8      •   failing to implement and maintain adequate security measures to

9          safeguard users' personal information;

10     •   failing to timely notify Plaintiffs and other Class Members of the

11         unlawful disclosure of their personal information; and

12     •   failing to maintain adequate security and proper encryption in Zoom's

13         videoconferences.

14     125.   The above-described breaches of contract have proximately caused and

15  inflicted actual damage to Plaintiffs and the Class Members.

16     WHEREFORE, Plaintiffs and the Class Members request relief as set forth

17  hereinbelow.

18

19              **THIRD CLAIM FOR RELIEF**
                      **(for restitution)**
20          **(Bus. & Prof.  Code, §§ 17200, *et seq.*)**
        **(by Plaintiffs and the Plaintiff Class, against Defendant, Zoom)**

21     126.   The averments contained in paragraphs 1 through 125 hereof are

22  incorporated herein by reference.

23     127.   Zoom's above-described acts are *unlawful* in at least the following

24  respects:

25     a.   By accessing user location data, and by providing that and other data

26         from phones and computers of Plaintiffs and Class Members to third

27         parties (including Facebook and Google), Zoom has, "... [k]nowingly

28

**COMPLAINT ON BEHALF OF THE NON-AMERICAN PEOPLES OF THE
FIVE EYES COUNTRIES; DEMAND FOR JURY TRIAL – PAGE 23**

accesse[d] and without permission ... use[d] ... computer[s], [and] computer system[s] [belonging to Plaintiffs and Class Members] ... to ... wrongfully control [and/]or obtain ... data [belonging to Plaintiffs and Class Members]," for purposes of Penal Code section 502, subdivision (c)(1); and

b.   By providing data from phones and computers of Plaintiffs and Class Members to third parties (including Facebook and Google), Zoom has, "... [k]nowingly accesse[d] and without permission take[n] copie[d], [and/]or ma[de] use of ... data from ... computer[s], computer system[s], [and/]or computer network[s] [belonging to Plaintiffs and Class Members]," for purposes of Penal Code section 502, subdivision (c)(2).

128.   Zoom's above-described acts are *unfair* in at least the following respects:

a.   the above-described invasions of privacy are tethered to the constitutional right of privacy guaranteed to all people by Article I, Section 1, of the California Constitution; and

b.   Zoom's practice of surreptitiously accessing user location data, and surreptitiously providing that and other data from phones and computers of Plaintiffs and Class Members to third parties (including Facebook and Google), all without the consent of Plaintiffs and the Class Members, is is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to Plaintiffs and the Class Members.

129.   Plaintiffs and the Class Members have each lost money and/or property as a direct and proximate result of Zoom's above-described unfair competition.

WHEREFORE, Plaintiffs and the Class Members request relief as set forth hereinbelow.

///

///

**COMPLAINT ON BEHALF OF THE NON-AMERICAN PEOPLES OF THE FIVE EYES COUNTRIES; DEMAND FOR JURY TRIAL – PAGE 24**

**FOURTH CLAIM FOR RELIEF**
**(for injunction)**
**(Bus. & Prof.  Code, §§ 17200, *et seq.*)**
**(by Plaintiffs and the Plaintiff Class, against Defendant, Zoom)**

130.   The averments contained in paragraphs 1 through 129 hereof are incorporated herein by reference.

131.   Plaintiffs note that the Court-approved settlement of the Prior Litigation includes, *inter alia,* the following injunctive covenant:

> "Zoom will request that Facebook delete any **U.S.** user data obtained from the integration of the Facebook Login SDK for iOS with Zoom Meetings within 30 days of the date that the settlement is final and unappealable, and will request that Facebook provide written verification that it has done so."

(*See,* Prior Litigation Document 191-1, at Page 19, at Section 3(e). [Emphasis added.])

132.   Zoom's above-described collection of Plaintiffs' and Class Members' sensitive personal data (including precise location data) to third parties (including Facebook and Google) could not have been consensual, because Zoom's particular conduct in doing so had not been disclosed in advance.

133.   The facts set forth hereinabove establish that Plaintiffs and the Plaintiff Class are entitled to injunctive relief to prevent continuing and/or future use and/or employment by Zoom of the above-described practices constituting unfair competition which have not already been enjoined by operation of the order granting final approval of the settlement of the Prior Litigation.

WHEREFORE, Plaintiffs and the Plaintiff Class request relief as set forth hereinbelow.

///
///
///
///

**COMPLAINT ON BEHALF OF THE NON-AMERICAN PEOPLES OF THE FIVE EYES COUNTRIES; DEMAND FOR JURY TRIAL – PAGE 25**

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Plaintiff Class request the following relief:

a.   On the First Claim for Relief, judgment over and against Defendant, Zoom, awarding monetary damages as a remedy for the above-described invasion of privacy;

b.   On the Second Claim for Relief, judgment over and against Defendant, Zoom, awarding monetary damages as a remedy for the above-described breaches of implied contract, including the covenant of good faith and fair dealing contained therein;

c.   On the Third Claim for Relief, judgment over and against Defendant, Zoom, awarding monetary restitution of all money and property Zoom has acquired by means of the above-described unfair competition;

d.   On the Fourth Claim for Relief, judgment over and against Defendant, Zoom:

    i.   compelling Zoom to perform the same acts with respect to Plaintiffs' and Class Members' sensitive personal data as it has performed with respect to, "... U.S. user data ...", pursuant to the above-quoted provision of the Court-approved settlement agreement in the Prior Litigation (*see,* Document 191-1, at Page 19, at Section 3(e)); and

    ii.   prohibiting Zoom from providing any of Plaintiffs' and Class Members' sensitive personal data (including but not limited to location data) to any third party in the absence of informed and effective consent, obtained upon disclosure of: (a) the identities of such third parties, (b) the precise nature of the data to be provided to such third parties, and (c) Zoom's understanding of the use or uses to which such third parties would put such data;

e.      and such other relief, at law or in equity, to which this Court may find

Plaintiffs and the Plaintiff Class to be entitled.

Dated: 31 May 2022                          Respectfully submitted,

DAVID J. GALLO
**LAW OFFICES OF DAVID J. GALLO**
12702 VIA CORTINA, SUITE 500
DEL MAR, CALIFORNIA  92014-3769
Telephone: (858) 509-3652


                                    /s/ David J. Gallo
By:      David J. Gallo,
         California Bar No. 127722
         Attorneys for Plaintiffs, S. WESTRON,
         and J. MILNE

[COMPLAINT filed 31MAY22.wpd]

**COMPLAINT ON BEHALF OF THE NON-AMERICAN PEOPLES OF THE FIVE EYES COUNTRIES; DEMAND FOR JURY TRIAL – PAGE 27**

**JURY DEMAND**

Plaintiffs, S. Westron and J. Milne, on behalf of themselves and the Plaintiff Class, hereby demand trial by jury of all issues triable by a jury pursuant to applicable law, including, but not necessarily limited to, the Seventh Amendment to the United States Constitution.

Dated: 31 May 2022                    Respectfully submitted,

DAVID J. GALLO
**LAW OFFICES OF DAVID J. GALLO**
12702 VIA CORTINA, SUITE 500
DEL MAR, CALIFORNIA 92014-3769
Telephone: (858) 509-3652


                           /s/ David J. Gallo
By:     David J. Gallo,
        California Bar No. 127722
        Attorneys for Plaintiffs, S. WESTRON,
        and J. MILNE

[COMPLAINT filed 31MAY22.wpd]

**COMPLAINT ON BEHALF OF THE NON-AMERICAN PEOPLES OF THE FIVE EYES COUNTRIES; DEMAND FOR JURY TRIAL – PAGE 28**